**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(NORFOLK DIVISION)**

| | |
|---|---|
| Consumer Financial Protection Bureau, | |
| Plaintiff, | No. 2:23-cv-110 |
| v. | |
| Portfolio Recovery Associates, LLC, | |
| Defendant. | |

**PORTFOLIO RECOVERY ASSOCIATES, LLC'S MEMORANDUM IN SUPPORT OF
RULE 60(b) MOTION TO MODIFY JUDGMENT**

COMES NOW, Portfolio Recovery Associates, LLC ("Defendant" or "PRA"), by and through undersigned counsel, and moves to modify this Court's stipulated final judgment and order (the "Order") to provide for termination of the judgment as satisfied, or in the alternative to modify specific provisions of the judgment. In support thereof, PRA states as follows:

**INTRODUCTION**

PRA respects the resolution it previously reached with the Consumer Financial Protection Bureau (the "Bureau"), which is reflected in this Court's Order. PRA is not seeking to vacate that judgment or to declare it void. Indeed, PRA has spent several years expending substantial resources in good faith compliance with that Order.

The Order, by its terms, retains jurisdiction in this Court for the purpose of enforcing this Order. It is in that regard that PRA brings this Motion. PRA respectfully submits that the Order has served its intended purpose and that modification of the Order is appropriate going forward. PRA has committed substantial monetary and personnel resources to comply with the Order since

1

its issuance nearly three years ago.  Among other things, PRA has in good faith compliance with the Order:

- created and implemented a compliance plan;

- created, implemented, and completed a redress plan;

- submitted annual compliance reports to the Bureau without objection;

- revised and enhanced its relevant policies to ensure continued compliance with federal law;

- obtained documentation and representations and warranties required by the Order for its debt collection activities;

- provided required documents to debtors;

- conducted training, supervision, and monitoring of law firms and other partners to ensure their continued compliance with federal law;

- calculated and paid at least $12.18 million in redress payments to consumers;

- paid a $12 million civil monetary penalty to the Bureau;

- distributed the Order to all required individuals and entities;

- maintained required documents;

- expanded its governance process to oversee compliance with the Order;

- enhanced the dispute process to comply with the Order and exceed the requirements of federal law; and

- enhanced customer disclosures to comply with the Order and exceed federal statutory requirements, among other compliance efforts.

In sum, PRA has fully satisfied the financial payment requirements of the Order and has been in compliance with the non-monetary provisions of the Order for a significant period of time.  These obligations have been substantial and onerous, but PRA has complied with them consistent with the Court's Order.

PRA respectfully submits that its ongoing obligations under the Order are no longer

2

necessary or equitable in light of its substantial compliance thus far and given the other means possessed by the Bureau to monitor and police its ongoing activities.  Accordingly, pursuant to Federal Rule of Civil Procedure 60(b), PRA now seeks a modification of the Order to provide for its early termination, relieving PRA of its ongoing requirements under the Order.  In the alternative, PRA respectfully seeks relief from specific, onerous provisions of the Order as detailed herein. These provisions are exceedingly costly for PRA (costs that have skyrocketed since the Order was entered), exceed the requirements of federal law, conflict with the Bureau's current guidance and enforcement priorities, and present no ongoing or prospective benefit to the public over and above what the law requires generally.

## FACTUAL BACKGROUND

### I.      The 2023 Order

On March 23, 2023, the Bureau sued PRA seeking injunctive and monetary relief and other civil penalties for alleged violations of law arising from its debt collection and furnishing activities. Dkt. 10 at 1.  That same day, the parties jointly moved for entry of a stipulated final judgment, Dkt. 2, which the court entered on April 13, 2023, Dkt. 10.  The Order contained no finding that PRA violated any law but reflected an agreement between the parties to resolve the Bureau's investigation, which was the basis of the Bureau's March 2023 suit.  This Court retained jurisdiction over the parties to enforce the Order.  Dkt. 10 ¶ 59.

The Order prohibits certain conduct and imposes affirmative requirements on PRA and its affiliates. Among other things, the Order enjoins PRA and its "officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them" from collecting on certain debts without heightened documentation requirements.  Dkt. 10 ¶ 7. The Order also requires PRA to process oral disputes from consumers, exceeding federal law,

3

which imposes this processing requirement only with respect to *written* disputes.  Dkt. 10 ¶ 5(j).

Additionally, PRA is required to make certain representations and statements to consumers and

credit reporting agencies; provide certain documentation to consumers; and track statistics for its

response to document requests from consumers. Dkt. 10 ¶¶ 8–14.  The Order also requires PRA to

create a compliance plan and a redress plan to address its implementation of the Order.  Dkt. 10

¶ 15.   Finally, the Order requires PRA to pay at least $12.18 million in redress to harmed

consumers and a $12 million civil penalty to the Bureau.  Dkt. 10 ¶¶ 21, 33.  The Order does not

include a termination date for many of its provisions.  As a result, PRA is required to comply with

provisions that far exceed state and federal law with no termination date.

## II.   PRA's Compliance with the Order

PRA has, and continues to, substantially comply with the Order.  In the last two years, PRA

has:

- created and implemented a comprehensive compliance plan that continued efforts to ensure its debt collection, dispute resolution, and furnishing practices comply with federal consumer financial laws and instituted processes to comply with the terms of the Order, which exceed federal requirements;

- developed enhanced policies and procedures and implemented an oversight program to ensure that law firm partners and other services providers also comply with the Order, which requires PRA and its partners to exceed the requirements of federal law;

- maintained and enhanced processes to investigate consumers' oral disputes at great effort and expense, far exceeding federal law requiring PRA—and its competitors—to process only written disputes, despite that oral disputes maintain a substantiation rate of only 5%;

- implemented a document-retention and monitoring process to ensure the maintenance of appropriate records;

- created and implemented a redress plan to identify five classes of harmed consumers and calculate redress payments owed to them;

- paid more than $14 million in redress payments to consumers, exceeding the Order's required $12.18 million minimum;

- paid the $12 million civil money penalty to the Bureau;

- submitted two annual compliance reports, ratified by the Board of Directors, to the Bureau without objection, which detail PRA's compliance with the Order, as well as the extensive actions taken by PRA to meet or exceed the requirements of the Order and ensure that its service partners do the same;

- submitted twelve monthly redress reports to the Bureau without objection, which detail PRA's efforts to identify redress consumers and calculate and make redress payments; and

- accomplished other compliance and redress efforts related to governance, monitoring, and reporting to further ensure adherence to the Order, including its provisions that require PRA to go above and beyond the requirements of state and federal law.

*See* Decl. of Keith Warren, attached hereto as **Exhibit 1**.  The Bureau has not contested PRA's compliance efforts nor alleged any non-compliance.

### III.    The Increasing Burden of Compliance

PRA's good faith compliance with the Order has become increasingly onerous.

For example, the Order requires PRA to investigate all oral disputes submitted by consumers, exceeding federal law requiring PRA to investigate only written disputes.  Dkt. 10 ¶ 5(j).  The Order also requires certain disclosures to consumers who affirmatively contact PRA, both in writing or orally, a mandate that is not found in state or federal law.  Dkt. 10 ¶ 7(c).  The time and effort required to respond to oral disputes is immense, especially when a dispute does not contain all of the necessary information.  Moreover, the volume of oral disputes is increasingly driven by the proliferation of "FinFluencers" and credit repair organizations.[1]  Those groups coach consumers to submit numerous frivolous oral disputes.  Despite the increase in oral disputes, the

---

[1] A FinFluencer is "a person who, by virtue of their popularity or cultural status, can influence the financial decision-making process of others through promotions or recommendations on social media." *Social Media Finfluencers—Who Should You Trust?*, Cal. Dept. of Fin. Protection & Innovation, https://dfpi.ca.gov/news/insights/social-media-finfluencers-who-should-you-trust/ (last accessed February 23, 2026).  FinFluencers seek to influence the public about a variety of financial topics, including debt reduction, credit score improvement, and investment decisions.

percentage of oral disputes that are substantiated has remained around five percent. As a result, investigating all oral disputes creates a material burden for PRA with little to no benefit to consumers.

The Order imposes additional burdens by burying PRA and consumers under duplicative paperwork. The Order requires PRA to provide certain documents to consumers, even if the consumer did not request it, and even if the consumer had previously received the documents. Dkt. 10 ¶¶ 9–11 (requiring PRA to take certain actions in "*all* written communications with a Consumer," or "*any time* a Consumer" requests documentation, or "*Any time* Defendant sues under a breach of contract theory" (emphases added)). For example, "[i]n all written communications with a Consumer made in connection with any Legal Collections . . . Defendant and its Law Firms must include a Clear and Conspicuous statement" that the consumer "may request, orally or in writing, copies of all documents" that PRA must maintain under a different provision of the Order, among other things, "unless Defendant has provided the documents within the previous year." Dkt. 10 ¶ 9. Under that provision, PRA must monitor all communications to ensure they contain this disclosure, which exceeds the requirements of federal law, and perennially renew the disclosure even if the consumer does not request the documents at the heart of the disclosure. Similarly, the Order also requires that "*any time* a Consumer with a Debt in Legal Collection . . . requests *any* document related to that Debt," PRA must provide "all documents," even ones not requested by the consumer, "[u]nless Defendant has already provided documents to the Consumer in the previous year." Dkt. 10 ¶ 10. As a result, PRA must provide all of its documents to consumers who have already obtained those documents if a year has passed. PRA is also required to provide all of its documents to consumers who are seeking a specific document, and not PRA's entire trove.

PRA does not dispute that it is important to provide relevant documents to consumers on request or when required by law.  But the Order's current, overbroad effect requires PRA to send reams of documents with no continuing benefit to the consumer.

The Order further burdens PRA by requiring PRA to retain records beyond state and federal law requirements.  Dkt. 10 ¶¶ 48–49.  The Order currently requires PRA to maintain certain business records for five years, Dkt. 10 ¶ 48, and copies of audits, training materials, marketing materials, communications with consumers, and other records for seven years, Dkt. 10 ¶ 49.  The burden of maintaining all these records has become increasingly onerous with the substantial increase in oral disputes from consumers, as noted above.  The Order thus burdens PRA with no commensurate benefit to consumers or regulators.

PRA appreciates that compliance is not meant to be easy or without its burdens.  But the burdens of complying with the Order have grown substantially since the Order's inception and are no longer equitable.

**ARGUMENT**

Federal Rule of Civil Procedure 60(b) provides that a final judgment or order may be set aside or modified for one of five enumerated reasons, including because "applying [the judgment] prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5), or for "any other reason that justifies relief," Fed. R. Civ. P. 60(b)(6).  Motions for relief under Rule 60(b)(5) and (b)(6) must be made "within a reasonable time."[2] Fed. R. Civ. P. 60(c)(1).

---

[2] Motions under Rule 60(b)(1)–(3) must be made within one year after entry of the judgment.  Fed. R. Civ. P. 60(c)(1).  Because PRA does not seek relief under those subsections, the one-year time limit does not apply.

### I.   This Court should terminate the Order.

### a.   This Court can terminate the Order under Rule 60(b)(5) or (b)(6).

Rule 60(b)(5) and (b)(6) present two paths by which this Court can terminate the Order. We discuss each in turn.

Rule 60(b)(5) permits a party to obtain relief from a judgment or order if "applying [the judgment] prospectively is no longer equitable." The Rule allows a court to modify a judgment if "'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). The party seeking relief has the burden of establishing that changed circumstances warrant relief, "but once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Id.* (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

Rule 60(b)(5) serves a particularly important function in cases where injunctions remain in force for many years. "[T]he passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Id.* at 447–48. "[W]hen confronted with any motion invoking this rule, a district court's task is to determine whether it remains equitable for the judgment at issue to apply prospectively and, if not, to relieve the parties of some or all of the burdens of that judgment on 'such terms as are just.'" *Alexander v. Britt*, 89 F.3d 194, 197 (4th Cir. 1996) (quoting Fed. R. Civ. P. 60(b)).

Alternatively, this Court can terminate the Order under Rule 60(b)(6). That Rule permits modification of the Order for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Rule 60(b)(6) is a catch-all provision that permits relief for "any other reason" when there are

8

"extraordinary circumstances" and "the reason for relief from judgment does not fall within the list of enumerated reasons given in Rule 60(b)(1)–(5)." *Aikens v. Ingram*, 652 F.3d 496, 500 (4th Cir. 2011). Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." *National Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 266 (4th Cir. 1993).

The Supreme Court has provided helpful guidance on Rule 60(b) motions in the context of ongoing consent decrees, like the Order at issue. In that circumstance, a Rule 60(b) movant must demonstrate: "(1) that for a reasonable period of time (2) they have complied in good faith with the consent decree (3) to the point that the 'vestiges' of past unlawful behavior have been eliminated 'to the extent practicable,' and thus the purpose of the decree has been satisfied." *Alexander*, 89 F.3d at 200 (quoting *Board of Education v. Dowell*, 498 U.S. 237, 249–50 (1991)).

### b. The balance of the equities favors termination.

### i. Changed circumstances exist under Rule 60(b)(5).

Under Rule 60(b)(5), applying the Order prospectively is no longer equitable since PRA has substantially complied with its terms. PRA has created and implemented a compliance plan; created and implemented a redress plan; revised its policies; obtained the required documents and representations and warranties for its debt collection activities; provided required documents and disclosures to debtors that exceed what is required by law and what is standard in the industry; conducted training, supervision, and monitoring of law firms and other partners; calculated and paid more than $14 million in redress payments to consumers; paid a $12 million civil money penalty to the Bureau; distributed the Order to all required individuals and entities; and maintained required documents, among other compliance efforts designed to ensure PRA's continued compliance with federal consumer financial laws. PRA's successful remediation efforts justify termination.

In determining whether circumstances justify termination, this Court should weigh the benefits of continued enforcement against the burdens imposed on PRA. *See Alexander*, 89 F.3d at 197. As discussed above, *supra* pp. 4–6, the burdens of complying with the Order have grown substantially since its inception, while the benefits to consumers and regulators have diminished or failed to materialize.

The Order's requirement that PRA investigate all oral disputes—a standard exceeding federal law—illustrates this imbalance.[3] As detailed above, the proliferation of FinFluencers and credit repair organizations has fundamentally altered the landscape of consumer disputes. Those groups coach consumers to submit numerous frivolous oral disputes, dramatically increasing PRA's compliance burden. Yet the substantiation rate has remained at approximately five percent. The Order thus compels PRA to expend substantial resources investigating disputes that are overwhelmingly meritless. *See* Decl. of Keith Warren ¶¶ 14–16. When the Order was entered, no party could have anticipated that third-party actors would exploit its provisions to flood PRA with frivolous disputes. Equity does not require PRA to bear this unanticipated and ever-growing burden indefinitely.

Additionally, eliminating the requirement that PRA investigate all oral disputes would not render consumers without redress. First, under the FDCPA and FCRA, PRA is still obligated to respond to disputes submitted directly to it in writing. 12 C.F.R. §§ 1006.38, 1022.43. Second, consumers also have the option to dispute information directly with the credit reporting agencies ("CRA"). *See* 15 U.S.C. § 1681i(a). The Bureau recently promoted that dispute avenue, adding language to their website advising consumers that before submitting a complaint with the Bureau,

---

[3] Under the Fair Debt Collection Practices Act ("FDCPA"), 12 C.F.R. § 1006.38, PRA need only respond to disputes submitted in writing. And under the Fair Credit Reporting Act ("FCRA"), 12 C.F.R. § 1022.43, PRA is only obligated to respond to disputes submitted to the correct address and which include specific information and supporting documentation.

they "MUST FIRST DISPUTE INACCURATE OR INCOMPLETE INFORMATION ON THEIR CREDIT REPORT WITH THE CREDIT REPORTING AGENCY." *Credit and consumer reporting complaint notice*, Consumer Fin. Prot. Bureau, (last modified Feb. 4, 2026, at 10:56 am EST), https://www.consumerfinance.gov/complaint/credit-and-consumer-reporting-complaint-notice/; *see also* 15 U.S.C. § 1681i(e) (exempting from the Bureau's reporting and reinvestigation obligations consumer complaints that *were not* previously reported to a CRA). If a consumer did not obtain a satisfactory resolution from the CRA, they can then file a complaint with the Bureau, as they do in droves.[4] The benefits of continued enforcement of the Order's oral-dispute provision are slim in contrast to the burden of continued enforcement, especially given the alternative dispute methods available to consumers and promoted by the Bureau.

Another example of the increasingly inequitable burden of compliance is the Order's documentation requirements. The Order mandates that PRA provide certain documents to consumers regardless of whether the consumer requested them, and regardless of whether the consumer already possesses them. Dkt. 10 ¶¶ 9–11. PRA does not dispute that consumers are entitled to relevant documents. But the Order's sweeping language—requiring action in "all" written communications, "any time" a consumers requests documents, and "any time" PRA pursues breach-of-contract claims, Dkt. 10 ¶¶ 9–11—has produced a regime of duplicative paperwork that burdens PRA and consumers alike without advancing a material benefit to consumers or regulators. PRA must monitor every communication for compliance, repeatedly renew disclosures the consumer may never act on, and potentially furnish yearly copies of its entire

---

[4] The most recent annual report published by the Bureau noted that consumer complaints about credit reporting increased 182% in 2024, while complaints about other personal consumer reports increased 124%. Consumer Fin. Prot. Bureau, Consumer Response Annual Report: January 1 – December 31, 2024, at 21 (2025). Additionally, the volume of complaints about debt collection increased by a staggering 333% from the previous year. *Id.* at 25.

document trove to consumers who already possess those records or who seek only a single specific document.  *See* Decl. of Keith Warren ¶ 17.  Those requirements exceed the demands of federal law and impose costs disproportionate to any benefit, especially in light of the increasing number of oral disputes.

The Order's record-retention requirements compound those burdens.  As discussed above, the Order requires PRA to maintain certain records for five or seven years, well beyond the periods required by state and federal law.  Dkt. 10 ¶¶ 48–49.  The growing number of oral disputes has made this obligation increasingly onerous, as PRA must now retain records associated with a vastly expanded volume of dispute-related communications.  PRA has undertaken great expense to store those records.

Additionally, early termination of the Order is in both the parties' and the public's best interest.  Courts have granted motions to terminate the Bureau's consent orders on the grounds that the defendant had already paid its required penalty and substantially complied with the order's terms.  *See United States v. Trustmark Nat'l Bank*, No. 2:21-cv-2664 (W.D. Tenn. May 21, 2025) (order); *CFPB v. Trident Mortgage Co.*, No. 2:22-cv-02936 (E.D. Pa. June 2, 2025) (order).  Here, it is no longer equitable to apply the Order prospectively when its remedial objectives have been completed, the Bureau's resources could be better spent pursuing violators rather than overseeing PRA's ongoing reports, and compliance has become increasingly onerous.

By imposing injunctive obligations on PRA that exceed what the law would otherwise require, the Order also puts PRA at a competitive disadvantage relative to other market participants who are able to operate free of the unnecessary cost and disruption the Order imposes on PRA. Recent executive guidance recognizes that it is inappropriate for federal regulatory agencies to use their power to "impose anti-competitive restraints or distortions on the operation of the free

market." *See* Exec. Order No. 14267, 90 Fed. Reg. 15629 (Apr. 9, 2025). The Bureau's

enforcement priorities have also changed to disfavor the type of enforcement that led to this Order.

The Bureau has recently rolled back guidance documents and enforcement actions to "only those

areas statutorily required," with the stated goal to "impose[] new obligations on the public only

when consistent with applicable law and after an agency follows appropriate procedures."

Interpretive Rules, Policy Statements, and Advisory Opinions; Withdrawal, 90 Fed. Reg. 20084

(May 12, 2025). The Order's provisions that impose extra-statutory obligations on PRA and

require it to exceed federal law are thus in conflict with the Bureau's current directives. These are

the type of changed circumstances under which *Alexander* approved terminating injunctions and

consent orders. 89 F.3d at 197.

In total, the Order imposes substantial and growing costs on PRA while delivering little

ongoing benefits to consumers or regulators. Changed circumstances since the Order's entry—

particularly the explosion of frivolous oral disputes driven by third-party actors and the stated

change in the Bureau's enforcement priorities—have upset the original balance struck by the

parties. Continued enforcement of the Order in its current form is no longer equitable, and the

Court should thus grant the Rule 60(b)(5) motion and terminate the Order.

### ii. Extraordinary circumstances justify termination under Rule 60(b)(6).

If this Court determines that Rule 60(b)(5) does not apply, it should grant this motion

pursuant to Rule 60(b)(6) because extraordinary circumstances justify relief. In addition to the

argument above, PRA has met the three *Alexander* factors: "(1) that for a reasonable period of time

(2) [PRA has] complied in good faith with the consent decree (3) to the point that the 'vestiges' of

past unlawful behavior have been eliminated 'to the extent practicable,' and thus the purpose of

the decree has been satisfied." *Alexander*, 89 F.3d at 200 (quoting *Board of Education v. Dowell*,

498 U.S. 237, 249–50 (1991)).

First, PRA has complied with the Order for nearly three years—since April 23, 2023. In that time span, PRA completed all remedial compliance and operational improvements designed to strengthen its debt-collection practices and ensure continued compliance with federal law. Recently, district courts have granted motions to terminate Bureau consent orders where the defendant had complied with the order for nearly three years. *See Trident Mortgage Co.*, No. 2:22-cv-02936 (E.D. Pa. June 2, 2025) (order); *Trustmark Nat'l Bank*, No. 2:21-cv-2664 (W.D. Tenn. May 21, 2025) (order). In the context of other Bureau consent orders, nearly three years is a reasonable time of compliance where, as here, that period has been characterized by good faith compliance.

Next, PRA has complied in good faith with the Order. As discussed in more detail above, the Order required PRA to make substantive policy changes, make redress payments to consumers, pay a civil money penalty to the Bureau, and continue reporting on progress implementing and following the Order, among other things. PRA has fulfilled all material obligations under the Order. It has paid consumers more than $14 million dollars in redress payments, paid the civil penalty in full, and implemented the required compliance enhancements. The Bureau has not claimed any failure of compliance in its dealings with PRA.[5]

Finally, any "vestiges" of PRA's past conduct have been eliminated by PRA's compliance with the Order. Although the Order made no finding that PRA had violated federal law, it imposed remedial obligations designed to strengthen PRA's debt-collection practices and ensure continued compliance with federal law. As noted above, PRA has substantially complied with the Order,

---

[5] Notably, even if the Order is terminated early, PRA remains subject to the Bureau's regulations and review. If the Bureau later has cause to believe that PRA is out of compliance with federal law, it may investigate and take appropriate action.

including enhancing its policies and procedures to ensure that it continues to comply with, and exceed, the requirements of federal law.  PRA has also completed all redress payments to consumers who were included in the redress populations.  PRA made more than $14 million in redress payments across five classes of consumers to remedy its past conduct.  *See* Dkt. 10 ¶ 21. Combined with the facts and equities of this case, including the burdens discussed above, *supra* pp. 8–12, extraordinary circumstances justify termination under Rule 60(b)(6).

**II.      If this Court does not terminate the Order, the Court possesses the power to and should modify specific provisions of the Order.**

PRA respectfully submits, as discussed above, that termination of the Order is justified based on the facts and equities of this matter.  But should this Court disagree that complete termination is warranted, PRA alternatively seeks modifications that provide relief from specific provisions of the Order.  Specifically, PRA requests that the Court make the following equitable adjustments to the Order to reduce the burden of the most onerous provisions that provide no ongoing or prospective benefit to consumers or the public:

**a.  Provisions Relating to Consumer Disputes**

*Section 5(j).*  The Order defines "Covered Dispute" as: "(a) any written or *oral* dispute concerning the accuracy or validity of a Debt submitted directly to Defendant or a Law Firm that includes sufficient information to identify the account or other relationship that is in dispute (including but not limited to any Direct Dispute); and (b) any Indirect Dispute."  Dkt. 10 ¶ 5(j) (emphasis added).  That definition as crafted requires PRA to investigate all oral disputes, as well as written or oral disputes made outside the regulatorily prescribed validation period, *see* 12 C.F.R. § 1006.34(d)(4).  As discussed above, that requirement far exceeds federal law and imposes substantial burdens on PRA in both time and expense.  When combined with the dramatic increase in oral disputes and the low substantiation rate, investigating *all* oral disputes creates a material

burden for PRA with little to no benefit to consumers.  As a result, PRA requests that the definition of "Covered Dispute" be limited to apply to Direct and Indirect Disputes only as required by federal law, *see* 12 C.F.R. § 1022.41(c).

*Section 7(c)*.  The Order also requires PRA to make certain disclosures to consumers who contact it: "when a Consumer affirmatively contacts Defendant about a Debt or as required by law, Defendant may communicate with and accept payment from the Consumer if Defendant Clearly and Conspicuously discloses to the Consumer that Defendant is investigating the accuracy and validity of the Debt and the Consumer may not owe the Debt."  Dkt. 10 ¶ 7(c).  Such disclosures are not required by any state or federal law.  Thus, the Court should remove this extra-statutory requirement.

*Section 13(b)*.  The Order enjoins PRA from resolving a dispute alleging fraud or identity theft in its favor "based solely on the facts that (a) Defendant possesses OALD reflecting the name and Claimed Amount, (b) the Consumer did not provide a fraud affidavit, police report, or other document evidencing fraud accepted by Defendant, and (c) the Consumer made a past payment on the Debt."  Dkt. 10 ¶ 13(b).  This provision runs counter to the standard of investigation established by federal law.  *See* 12 C.F.R. § 1022.43.  Moreover, industry data indicates a surge in alleged identity-theft claims that is not matched by a rise in actual identity theft.  The disparity is due at least in part to the proliferation of FinFluencers and CROs that have amplified the problem and propounded online templates encouraging consumers to file identity-theft affidavits without proper understanding, leading to abuse of the FTC's Identity Theft program and fraudulent submissions thereto.  Section 13(b)'s prohibition arose as an effort by the Bureau to define what was not sufficient as a "reasonable investigation" under the FCRA, 12 C.F.R. § 1002.43(a).  Without Section 13(b), PRA will still be required by federal law to conduct a reasonable investigation of

fraud and identify-theft complaints, but can make a fact-specific determination whether an identity-theft claim with the three pieces of evidence outlined in that section is sufficient or should be denied. Thus, PRA respectfully requests that this provision be struck.

### b.   Provisions Relating to Document Retention

*Sections 48 and 49.*  The Order further requires PRA to maintain certain business records for five years and copies of audits, training materials, marketing materials, communications with consumers, and other records for seven years.  Dkt. 10 ¶¶ 48–49.  As discussed above, the requirement to store troves of documents and communications with consumers is needlessly burdensome with no continuing benefit to consumers or the public.  PRA respectfully requests that these provisions be modified to reduce record-retention requirements to the greater of three years or any existing applicable requirement under state or federal law.  *See, e.g.*, 12 C.F.R. § 1006.100 (requiring debt collectors to maintain records of FDCPA compliance, including phone call recordings, for three years).  Such a revision would ensure that PRA keeps records for a substantial period of time, while not crushing PRA under the weight of mountains of records well past their date of creation.

### c.   Provisions Relating to Document Production to Consumers

*Sections 9, 10, and 11.*  Multiple sections of the Order require PRA to take certain actions in "*all* written communications with a Consumer" or "*any time* a Consumer" requests documentation about a debt or "*Any time* Defendant sues under a breach of contract theory."  Dkt. 10 ¶¶ 9–11 (emphases added).  The overbreadth of these sections results in a material burden for PRA with no ongoing or prospective benefit to the consumer.  For example, "[i]n all written communications with a Consumer made in connection with any Legal Collections . . . Defendant and its Law Firms must include a Clear and Conspicuous statement" that the consumer "may

17

request, orally or in writing, copies of all documents" that PRA must maintain under a different provision of the Order, among other things, "unless Defendant has provided the documents within the previous year." Dkt. 10 ¶ 9. As discussed above, that provision requires PRA to monitor all communications to ensure they contain this disclosure, which exceeds state and federal law requirements, and perennially renew the disclosure even if the consumer does not request the documents at the heart of the disclosure. That burden has only grown with the rise in oral disputes.

The Order also requires that "*any time* a Consumer with a Debt in Legal Collection . . . requests *any* document related to that Debt," PRA must provide "all documents," even ones not requested by the consumer, "[u]nless Defendant has already provided documents to the Consumer in the previous year." Dkt. 10 ¶ 10. "[A]ll documents" includes the exhaustive list in Section 7(g):

(i)    Documents for Collecting;
(ii)   A chronological listing of the names of all prior owners of the Debt and the date of each transfer of ownership of the Debt, beginning with the name of the Creditor at the time of Charge-off;
(iii)  Each bill of sale or other document that evidences the transfer of ownership of the Debt at the time of Charge-off to each successive owner, including Defendant, and specifically refers to the particular Det that Defendant is Collecting, which can be done by referencing an exhibit attached to each bill of sale or other document transferring ownership of the Debt that is represented or warranted by a Seller to be a list of all Debts acquired in that Portfolio; and
(iv)   Either (1) a document signed by the Consumer evidencing the opening of the account forming the basis for the Debt; or (2) OALD reflecting a purchase or payment.

Dkt. 10 ¶ 7(g).

The result of this requirement is that PRA could be made to turn over yearly copies of all its documents, even to consumers who have already obtained the documents, or who are seeking a specific document, and not PRA's entire trove. Federal law and the judicial process already regulate production of documents to consumers. This provision of the Order has in application served to bury PRA, and indeed the consumer as well, in duplicative paperwork. PRA thus

18

respectfully requests that these provisions be struck.

### d. Miscellaneous Provisions

*Section 5(g).*  The Order defines the terms "Collection," "Collecting," or "Collect," despite that they are not defined in the FDCPA, FCRA, or elsewhere in federal law.  The Order defines those terms to mean "making a representation, expressly or by implication, that a Consumer owes a Debt or about the amount of the Debt or *otherwise taking any action with a consumer* in furtherance of obtaining payment for a Debt."  Dkt. 10 ¶ 5(g) (emphasis added).  This broad language applies only to PRA, not other market participants, putting PRA at a competitive disadvantage.  This provision is also in tension with the Bureau's guidance disfavoring imposing extra-statutory obligations on debt collectors.  *See* Interpretive Rules, Policy Statements, and Advisory Opinions; Withdrawal, 90 Fed. Reg. 20084 (May 12, 2025).  The Court should thus strike this definition.

*Section 15(i).*  The Order also requires PRA conduct "an internal annual audit of Defendant's compliance with and Defendant's policies and procedures relating to compliance with this Order, the CFPA, the FDCPA, and FCRA."  Dkt. 10 ¶ 15(i).  PRA does not dispute the value in continuing to audit its adherence to the Order and Compliance Plan and does not propose modification to that requirement.  However, the other required audits (CFPA, FDCPA, and FCRA) are excessive and do not produce helpful results.  Like any effective audit department, PRA's audit team endeavors to review the highest-risk functions within the company to eliminate the greatest risks to both consumers and PRA.  Since the Order, PRA's audit team has been hampered by the breadth and annual cadence of the required audits.  As a result, the audit team is constrained from exercising the very independence that is needed for it to optimize its ongoing review of PRA's highest-risk functions.  PRA respectfully requests modification of this provision so that its internal

19

audit team is permitted to focus on the highest-risk areas identified using their established methodology, rather than inflexible annual requirements to review CFPA, FDCPA, and FCRA compliance. Undoubtedly there will be overlap between the audits PRA chooses to conduct and compliance with CFPA, FDCPA, and FCRA. But flexibility will allow PRA to best protect its consumers and its business by focusing on the areas of greatest risk.

*Sections 21–25 and 27–30.* PRA requests that the Court clarify the redress provisions of the Order. PRA has completed the redress provisions in Sections 21–25 and 27–30: it submitted a redress plan, received non-objection, executed the redress plan, and paid more than the $12.18 million floor for redress payments, validated by PRA's audit department. Despite best efforts to contact consumers who received redress payments, some have failed to cash the check. The current Order is unclear on how PRA can treat the funds for redress payments that have gone un-cashed. Sections 25 and 26 of the Order provide that if PRA paid an amount less than the $12.18 million payment floor, then it must wire the remaining funds up to the floor to the Bureau, which may, in its sole discretion, pay additional redress to consumers or deposit any remaining funds in the U.S. Treasury as disgorgement. Dkt. 10 ¶¶ 25–26. But PRA paid more than $12.18 million in redress payments to consumers. Thus, it is not obligated to return the uncashed funds to the Bureau. Declaring that PRA has satisfied these sections of the Order would grant PRA clarity and flexibility as to how to treat the remaining uncashed funds.

*Lastly*, if this Court declines to terminate the Order or modify specific provisions as requested above, PRA respectfully requests that this Court impose a reasonable end date to the Order. Currently the Order has no end date, meaning that certain provisions that are not already time limited are effective indefinitely. Those everlasting provisions include the requirement for PRA to provide excessive documentation to consumers on an annual basis, even when consumers

20

have not requested such documents, among others. *See, e.g.*, Dkt. 10 ¶¶ 8–12. Permanent application of these provisions serves no legitimate purpose. Thus, PRA requests that at a minimum, this Court modify the Order to provide for its termination 5 years from the Effective Date of the Order, April 13, 2023.

**CONCLUSION**

The balance of equities favors termination of the Order to relieve both PRA and the Bureau of the burden of ongoing reporting obligations, the remedial purpose of which is no longer necessary in light of changes at PRA and PRA's substantial, good faith compliance to date. PRA respectfully requests that this Court (1) terminate the Order, (2) in the alternative, if this Court does not terminate the Order, modify certain provisions of the Order as discussed *supra*, Section II, or (3) if this Court does not terminate the order or modify the requested provisions, impose a global end-date on the Order of four years from the date of entry.

Dated: March 11, 2026                    Respectfully submitted,

**Portfolio Recovery Associates, LLC**
*By Counsel*

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510
Telephone: (757) 640-3700
Fax: (757) 640-3701
bhatch@mcguirewoods.com

*Counsel for Defendant Portfolio Recovery Associates, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 11th day of March, 2026, a true and correct copy of the foregoing was

served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF

system.


/s/ *Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510
Telephone: (757) 640-3700
Fax: (757) 640-3701
bhatch@mcguirewoods.com

22